IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONNELL RIDDICK,                     :
            Petitioner,        :        3:17-cv-0740
                              :
    v.                               :
                              :        Hon. John E. Jones III
SUPERINTENDENT CYNTHIA               :
LINK, *et al.*,                      :
          Respondents.          :

# MEMORANDUM[1]

## June 2, 2020

Petitioner Donnell Riddick ("Petitioner" or "Riddick"), a state inmate, files the instant petition (Doc. 1) for writ of habeas corpus pursuant to 28 U.S.C. § 2254, and supporting memorandum (Doc. 6), seeking relief from the Judgment of Sentence of life without parole entered in the Court of Common Pleas of Lackawanna County, Pennsylvania, on December 19, 2006, in criminal case CP-35-0781-2005, following a first-degree murder conviction.  Respondents answered the petition with a Response (Doc. 12), Memorandum of Law (Doc. 13) and Exhibits (Doc. 14).  Thereafter, Riddick filed a Traverse.  (Doc. 25).

The petition, which  is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L.No. 104-132, 110 Stat. 1214, April 24,

---

[1] This matter has been reassigned due to the death of the Honorable James M. Munley.

1996, is ripe for decision.  For the reasons set forth below, the petition will be denied.

Additionally, on May 27, 2020 Riddick filed a motion (Doc. 30) to amend requesting that this Court review the legality of his sentence.  The motion will be denied as the claim was not presented in his original federal petition and he executed a Notice of Election limiting review to the claims set forth in the petition and his supporting memorandum.  (Docs. 1, 5, 6).   Further, it does not appear that he raised the issue in the state courts in either his direct appeal or collateral proceedings.  (Doc. 14-11, p. 12; Doc. 14-19, pp. 11, 12).

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The Superior Court of Pennsylvania set forth the following underlying facts, summarized by the trial court, that led to Riddick's first-degree murder conviction for the December 9, 2004, murder of Robert Lewis:

> On the evening of December 8, 2004, a birthday party was planned at Chaser's Bar for an unidentified friend of Barry Edwards, also known a "B-Red."  According to Edwards' testimony, he had previously asked defendant Donnell Riddick to help get the party together.
>
> On December 8, 2004 and sometime prior to the aforementioned party, defendant Riddick and others drove to a liquor store located in Clarks Summit, Pennsylvania, and purchased at least two bottles of Martini and Rossi Asti Spumanti which he took to the party.  Sometime before midnight, defendant Riddick and his girlfriend, Esther Ross, arrived at Chaser's Bar.

Although there was a birthday party that night at Chaser's Bar, the bar was nonetheless open to the public. The bar was owned by Joseph Roman. Frank Roman, Joseph's brother, assisted in its operation. Both Joseph and Frank were present on the evening in question. Sometime after Riddick's arrival, an argument broke out between the defendant Riddick and [Robert] Lewis. It appears that the argument that evening ignited because Esther Ross, Riddick's girlfriend, was taking pictures with a camera inside the bar. Robert Lewis, also known as "Ghost," reacted to the flash of the camera, and got up to take the camera away from Ross. Barry Edwards, also known as "B-Red," classified the events following [that] event as an "uproar." Specifically, he stated, "[W]e knew the picture was being token [sic]. I didn't see [Esther] actually snapping pictures, but the way ["Ghost's] body language was, we knew something was wrong." Edwards ("B-Red") stated his impression of the situation as follows:

> I guess he [Ghost] was upset that [Esther] took a picture of him considering that we all out here, you know, I mean, I'm bogging [sic] for the possession with intent to deliver drugs so we were all out here doing what we do and I guess he felt in some type of way, he felt violated because she took a picture of him. And I'm not sure if it was true at the time. He told me he was wanted in other states … I guess he didn't want the camera to get into the wrong hands and than [sic] that would be it.

At some point in the evening, Lewis ("Ghost") took the camera, and then passed the camera to Terrence Wright, another patron at the bar, known as "Biz."
Lashawnna ("Toni") Bennett watched Lewis ("Ghost") take the camera. Wright ("Biz") the put the camera in his pocket. At that point, some sort of confrontation or discussion took place between the defendant and Lewis ("Ghost"). According to Wright ("Biz"), defendant asked Lewis ("Ghost") for the camera back, stating that he "was not leaving without it." Edwards ("B-Red") testified to the "tension" in the bar that night, and stated:

> I can't repeat word-for-word obviously, it was … 'Give me the camera back. That's my girl's camera.' … And then Ghost was

3

pleading his story why he took it … 'We all out here selling drugs, we're all out hustling.  I'm saying this camera gets in the wrong hands, I could get in trouble basically.  That was the main, that was the argument.

One witness testified that the defendant Riddick, at one point, during the heated argument, pulled out a weapon when he was inside the bar.  At or about 1:50 a.m., and while the argument was continuing, the owner Joseph Roman told everyone to leave the bar.  Joseph Roman and his brother, Frank, ushered everyone out the door.  The argument continued outside among a wide variety of onlookers.

While outside, the defendant Riddick continued to demand the return of the camera.  The thrust of the heated discussion was directed primarily at Lewis and a woman identified as "Bennett," a/k/a "Toni." At some point during the verbal exchange, Lewis walked to his car which was parked nearby.  Lewis got in the car momentarily.  He then got out of the car and proceeded towards defendant Riddick.  [FN 3: Barry Edwards ("B-Red") testified that he recalled Lewis walking to his car and reaching into his glove compartment.  Lewis then got out of the car and headed back towards defendant.  Edwards ("B-Red") claims that he asked Lewis if he had a gun, to which Lewis responded, "Don't worry about it.  Just tell your man to put his down."

While arguing with Lewis and Bennett, defendant Riddick pulled out a gun and shot the weapon two times, in the ground and/or in the air.  When the initial rounds were fired, Lewis started to run away from the defendant, crossing Cedar Avenue.  Defendant Riddick proceeded to shoot Lewis three (3) times, striking him in the wrist, buttock, and back area.

After being shot three times, the victim, Lewis, continued to run a short distance after which he struck a building, fell to the ground, and died at the scene.

After the shooting, defendant Riddick gave Cashandra Matthis the gun and both he and Cashandra left the bar area separately.  Matthis took the gun, put it in a paper bag, and placed the gun in the bushes several

blocks from her residence.  At some point during the course of that day, defendant and Esther Ross appeared at Matthis' residence.  Matthis retrieved the gun and gave it back to the defendant.  Matthis testified that defendant stayed at her residence approximately three days.  During that time, defendant admitted to killing Lewis.

An autopsy was performed on the victim shortly after the subject incident.  Dr. Gary Ross, a board certified forensic pathologist, testified that all three shots that had struck the victim struck him in the back.  One shot struck the victim in the wrist.  One shot struck the victim in the right buttock.  The third and fatal shot struck the victim in the left upper back and traveled through the aortic arch of the heart.  This shot actually perforated the aorta causing Lewis to bleed profusely and ultimately die.

Doc. 14-14, pp. 1-4 (quoting trial court opinion, June 14, 2007, pp. 3-7 (citations omitted)).

Procedurally, on December 19, 2006, a jury found Riddick guilty of first-degree murder.  (Doc. 14-21, p. 1).  On January 29, 2007, the trial court sentenced him to life in prison without parole.  (*Id.*).  The Superior Court of Pennsylvania ("Superior Court") affirmed the judgment of sentence on June 2, 2008.  (Doc. 14-14).

Thereafter, Riddick pursued relief pursuant to the Post Conviction Relief Act ("PCRA"), 42 PA.C.S.A. §§ 9541-9546, seeking a reinstatement of his rights to file a petition for allowance of appeal with the Supreme Court of Pennsylvania ("Supreme Court").  (Doc. 14-21, p. 1).  The PCRA court granted relief and, on April 15, 2014, the Supreme Court denied the petition.  (Doc. 14-16, p. 21).

Riddick filed a timely PCRA petition.  On March 11, 2015, the PCRA court filed a Memorandum and Notice of Intent to Dismiss.  (Doc. 14-17).  The court supplemented the Memorandum and Notice of Intent to Dismiss on May 7, 2015.  (Doc. 14-18).  On June 18, 2015, the PCRA court denied the petition.  (Doc. 14-21, p. 1).  The Superior Court affirmed the order denying relief on June 22, 2016.  (*Id.* at pp. 1-10; *Commonwealth v. Riddick*, No. 1253 MDA 2015, 2016 WL 4697822 (Pa. Super. Ct. June 22, 2016).  On November 8, 2016, the Supreme Court denied Riddick's petition for allowance of appeal.

Thereafter, Riddick timely filed the instant petition pursuant to 28 U.S.C. § 2254.

## II.   28 U.S.C. § 2254 STANDARDS OF REVEW

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper mechanism for a prisoner in custody pursuant to the judgment of a state court to challenge the "fact or duration" of his confinement.  *Preiser v. Rodriguez*, 411 U.S. 475, 498-99 (1973).  28 U.S.C. § 2254, provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

6

(b)(1) an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –

> (A)   the applicant has exhausted the remedies available in the courts of the State;
>
> ...

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254.

Section 2254 clearly sets limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner. *Cullen v. Pinholster*, 536 U.S. 170, 181 (2011); *Glenn v. Wynder*, 743 F.3d 402, 406 (3d Cir. 2014).  A federal court may consider such a petition only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  By limiting habeas relief to state conduct which violates "the Constitution or laws or treaties of the United States," § 2254 places a high threshold on the courts.

7

Further, a federal habeas court may not consider a petitioner's claims of state law violations; review is limited to issues of federal law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Engle v. Isaac*, 456 U.S. 107, 120 n.19 (1982) ("If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable.").

## III.   <u>GROUNDS FOR RELIEF</u>

Riddick seeks habeas relief based on the following grounds:

I.    The evidence presented at trial was insufficient to support [the] conviction in violation of the Sixth and Fourteenth Amendments.

II.   The trial court erred in denying motion to suppress evidence in violation of the 4th, 6th and 14th Amendments.

III.  The trial court erred by allowing police officer testimony relating to prior bad acts allegedly committed.

IV.   Trial counsel was ineffective based on the following:

a.    Trial counsel failed to investigate and adequately prepare for Commonwealth witnesses Barry Edwards and Terrence Wright and failing to discredit their perjured testimony;

b.    Trial counsel failed to object to the Commonwealth introducing evidence of firearm paraphernalia at trial;

8

    c.       Trial counsel was ineffective for abandoning innocence defense and arguing self defense during closing arguments;

    d.       Trial counsel was ineffective for failing to request a hearing to test the veracity of the statements made in the Affidavit of Probable Cause supporting the search and seizure of the Petitioner's vehicle;

    e.       Trial counsel was ineffective for failing to establish a different version of the facts given Kendall Scott had been identified as the perpetrator of the homicide;

    f.       Trial counsel was ineffective for advising the Petitioner not to testify on his own behalf.

    g.       Trial counsel was ineffective for failing to present a ballistic witness during trial;

    h.       The cumulative errors committed by counsel deprived Petitioner of a fair trial.

(Doc. 1, pp. 5, 6, 8-10; Doc. 6, pp. 15, 16).

## IV.   DISCUSSION

### A.   Exhaustion and Procedural Default

Absent unusual circumstances, a federal court should not entertain a petition for writ of habeas corpus, unless the petitioner has first satisfied the exhaustion requirement articulated in 28 U.S.C. § 2254(b).  Specifically, habeas relief "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  The exhaustion requirement is

grounded on principles of comity to ensure that state courts have the initial

opportunity to review federal constitutional challenges to state convictions. *See*

*Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000); *Picard v. Connor*, 404 U.S.

270, 275–76 (1971).

The habeas statute codifies this principle by requiring that a petitioner

exhaust the remedies available in the courts of the State, 28 U.S.C. §

2254(b)(1)(A), meaning a state prisoner must "fairly present" his claims in "one

complete round of the state's established appellate review process," before

bringing them in federal court. *O'Sullivan*, 526 U.S. at 845 (stating "[b]ecause the

exhaustion doctrine is designed to give the state courts a full and fair opportunity

to resolve federal constitutional claims before those claims are presented to the

federal courts, . . .  state prisoners must give the state courts one full opportunity to

resolve any constitutional issues by invoking one complete round of the State's

established review process."); *see also Duncan v. Henry*, 513 U.S. 364, 365

(1995); Picard, 404 U.S. at 275 (1971); *Lambert v. Blackwell*, 134 F.3d 506, 513

(3d Cir. 1997).  This requires that the claim brought in federal court be the

substantial equivalent of that presented to the state courts. *Picard*, 404 U.S. at 278;

*see also McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999) (holding that

petitioner must present both "factual and legal substance" of claim to state courts).

Mere reliance of state and federal claims on the same constitutional provision does not render the two claims substantially equivalent. *See Brown v. Cuyler*, 669 F.2d 155 (3d Cir. 1982); *Zicarelli v. Gray*, 543 F.2d 466 (3d Cir. 1976). Both the legal theory and the facts on which a federal claim rests must have been presented to the state courts. *See Picard*, 404 U.S. at 277; *Brown*, 669 F.2d at 158–61.

"When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.' 28 U.S.C. § 2254(b). In such cases, however, applicants are considered to have procedurally defaulted their claims and federal courts may not consider the merits of such claims unless the applicant establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse his or her default. *See Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)." *McCandless*, 172 F.3d at 260.

To demonstrate "cause" for a procedural default, a petitioner must point to some objective external factor which impeded his efforts to comply with the state's procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Prejudice" will be satisfied only if he can demonstrate that the outcome of the state proceeding was "unreliable or fundamentally unfair" as a result of a violation of

11

federal law.  *See Lockhart v. Fretwell*, 506 U.S. 364, 366 (1993).

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent," *Murray*, 477 U.S. at 496, then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001).  The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency.  *Bousley v. United States*, 523 U.S. 614, 623 (1998); *Murray*, 477 U.S. at 496.  A petitioner establishes actual innocence by asserting "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

1.   Claim III – Prior Bad Acts Testimony

Riddick "acknowledges that the federal courts have decided that 'the availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution.' *Sawyer v. Smith*, 497 U.S. 227, 239 (1990) quoting *Dugger v. Adams*, 489 U.S. 401, 409 (1989).  [And that]

'federal courts sitting in habeas do not review state courts' application of state evidence law.' *Jones v. Cain*, 600 F.3d 527 (5th Cir. 2010)."  (Doc. 6, p. 25).  He argues, however, that the rule is not absolute and that "the instant claim is cognizable given it is not rooted in the correctness of the trial court's ruling but rather, the denial of due process."  (*Id.* citing, *Jones, supra*).  Respondents argue that the claim is not exhausted in that Riddick failed to raise such a due process violation in the state courts.  (Doc. 13, pp. 26-28).

In each of his direct appeal briefs, Riddick devoted approximately three pages to the issue that the trial court abused its discretion in admitting "unduly prejudicial" prior bad act testimony.  (Doc. 14-12, pp.20-22; Doc. 14-15, pp. 21-23).  In setting forth the rationale for barring evidence of prior criminal activity, reciting the circumstances under which such testimony can be admitted, and noting the prohibition on using such evidence for impeachment purposes, he wholly relied on state case law.  The words "due process" do not appear in the argument, there is no reference to the Fourteenth Amendment, and neither the United States Constitution, nor any judicial decision based on the federal Constitution, are mentioned in either appellate brief.   And he acknowledged that "[t]he admissibility of evidence is within the sound discretion of the trial court and that an appellate court may reverse only where there is a showing that the lower court

had abused its discretion." (Doc. 14-12, pp. 20, 21, citing *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621 (1995); *Commonwealth  v. Bartlett*, 446 Pa. 392, 400, 288 A.2d 796, 799-800 (1972); Doc. 14-5, p. 22).  Moreover, the state court understood the arguments concerning this evidence to be based on the evidentiary principles set forth in Rules 404(b)(1) and (3) of the Pennsylvania Rules of Evidence and Pennsylvania law.  (Doc. 27, pp. 16-20).

If a petitioner wishes to claim that an evidentiary ruling at a state court trial denied him due process, he must say so, not only in federal court, but in state court. *Duncan*, 513 U.S. at 366.  Because Riddick  failed to invoke the federal due process guarantee in the state court proceedings, his current federal due process claim was not fairly presented to the Pennsylvania courts.  There is no question that the Pennsylvania courts would not entertain the claim at this juncture.  Hence, the claim is procedurally defaulted. *See McCandless*, 172 F.3d at 260.  Riddick does not allege cause or prejudice.  Nor does he allege that lack of review by this court will constitute a fundamental miscarriage of justice. Consequently, habeas review of this claim is foreclosed.

2. <u>Claim IV – Ineffective Assistance of Counsel</u>

a. *Trial counsel's failure to investigate and adequately prepare for Commonwealth witnesses Barry Edwards and Terrence Wright*

14

In Claim IV(a), Riddick raised the issue of trial counsel's ineffectiveness in failing to investigate and adequately prepare for the cross examination of Commonwealth witnesses Barry Edwards ("Edwards") and Terrence Wright ("Wright").  This is not the issue he litigated during the PCRA proceedings.  The PCRA court identified the issue raised by Riddick as the "Commonwealth deliberately and intentionally used perjury by Commonwealth Witness Barry Edwards."  (Doc. 14-7, p. 4).  In rejecting the claim the court found, *inter alia*, that "[d]efense counsel vigorously attacked Edwards' credibility" during cross examination.  (*Id.* at 7).  It does appear the PCRA court may have failed to address the issue as it related to Wright.  However, he abandoned the claim as to Wright on appeal.  Specifically, in his appeal brief to the Superior Court, Riddick only pursued the issue as to Edwards; Wright is not mentioned.  (Doc. 14-19, p. 13).  Consequently, the Superior Court limited its discussion to whether trial counsel was ineffective in failing to object to Edwards' perjured testimony.  (Doc. 14-21, pp. 4, 5).  Riddick then attempted to resurrect the issue in his Petition for Allowance of Appeal and the Commonwealth objected noting that he abandoned the claim with respect to Wright when he failed to raise it in the Superior Court.  (Docs. 14-22, p. 13; ).

The above demonstrates that the entire claim Riddick presents here is unexhausted.  In the state court Riddick asserted trial counsel was ineffective for failing to object to the perjured testimony of Edwards and Wright.  The issue raised instantly is trial counsel's failure to investigate and adequately prepare Commonwealth witnesses Edwards and Wright.  Although the issues converge as to trial counsel's ineffectiveness, the underlying claims raised vary greatly and carry with them different standards of review.  There is no question that the Pennsylvania courts would not entertain the claim at this juncture.  Hence, the claim is procedurally defaulted. *See McCandless*, 172 F.3d at 260.  Riddick does not allege cause or prejudice. Nor does he allege that lack of review by this Court will constitute a fundamental miscarriage of justice. Consequently, habeas review of this claim is foreclosed as the claim is procedurally defaulted.

Alternatively, we note that even if the issue mirrored the one raised in state court, it is clear that Riddick abandoned the claim as it pertained to Wright when he failed to include him in his Superior Court brief.  Conversely, he fully exhausted the claim that trial counsel was ineffective in failing to object to Edwards' perjured testimony.  We will therefore address the merits of the claim, as it relates to Edwards, in the merits discussion, *infra*.

> b.    *The cumulative errors committed by counsel deprived Petitioner of a fair trial.*

16

This claim is also procedurally defaulted.  Although Riddick raised the claim before the PCRA court, he did not include it in the briefs filed in the state appellate courts.  (Doc. 14-17, p. 15; Doc. 14-19; Docs. 14-21 through 14-24).  Because the claim is no longer capable of state court review, while exhausted, it is procedurally defaulted. *See McCandless*, 172 F.3d at 260.  Riddick does not allege cause or prejudice for the default. Nor does he allege that lack of review by this court will constitute a fundamental miscarriage of justice.  As such, he is unable to excuse the procedural default; federal review is barred.

## B.      Merits of Federal Claims

As set forth *supra*, under the AEDPA, federal courts reviewing a state prisoner's application for a writ of habeas corpus may not grant relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "In considering a § 2254 petition, we review the 'last reasoned decision' of the state courts on the petitioner's claims." *Simmons v. Beard*, 590 F.3d 223, 231–32 (3d Cir. 2009)

17

(citing *Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008) ). Thus, "[w]e review the appellate court decision, not the trial court decision, as long as the appellate court 'issued a judgment, with explanation, binding on the parties before it.' " *Burnside v. Wenerowicz*, 525 F. App'x 135, 138 (3d Cir. 2013). However, when the highest state court that considered the claim does not issue a reasoned opinion, we "look through" that decision to the last reasoned opinion of the state courts, and we apply a rebuttable presumption that the higher court adopted the same reasoning as that set forth by the lower court. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

"[B]ecause the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction," *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (internal quotations and citations omitted), "[t]his is a difficult to meet and highly deferential standard . . . which demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181(internal quotation marks and citation omitted). The burden is on Riddick to prove entitlement to the writ. *Id.*

A decision is "contrary to" federal law if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision

18

of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[A] state court decision reflects an 'unreasonable application of such law' only 'where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents,' a standard the Supreme Court has advised is 'difficult to meet' because it was 'meant to be.' [*Harrison v*.] *Richter*, 562 U.S. 86, [ ] 102, 131 S.Ct. 770. As the Supreme Court has cautioned, an 'unreasonable application of federal law is different from an incorrect application of federal law,' *Richter*, 562 U.S. at 101, 131 S.Ct. 770 (quoting *Williams*, 529 U.S. at 410, 120 S.Ct. 1495), and whether we 'conclude[ ] in [our] independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly' is irrelevant, as AEDPA sets a higher bar. *Williams*, 529 U.S. at 411, 120 S.Ct. 1495." *Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 476 (3d Cir. 2017). A decision is based on an "unreasonable determination of the facts" if the state court's factual findings are objectively unreasonable in light of the evidence presented to the state court. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Finally, Section 2254(e) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the

judgment of a State court, a determination of a factual issue shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

### 1.   Ground I -  Sufficiency of the Evidence

Riddick raised this claim during post-trial motions and pursued it on direct appeal.  In affirming the judgment of sentence, the Superior Court adopted the trial court's June 14, 2007 opinion as to the sufficiency of the evidence claim.  (Doc. 14-14, pp. 8, 9; Doc. 27, pp. 8-14).  Hence, our main focus will be the trial court's opinion.

The "clearly established Federal law" governing sufficiency of the evidence claims is set forth in the United States Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979).  Under *Jackson*, evidence is sufficient to support a conviction if, "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.  "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.' " *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (quoting *Jackson*, 443 U.S. at 319).

In rejecting Riddick's sufficiency of the evidence claim, the trial court set

forth the following:

> A claim challenging the sufficiency of the evidence to support a verdict
> is essentially a question of law. *Com. v. Widmer*, 744 A.2d 745 (Pa.
> 2000).   In reviewing the sufficiency of the evidence, the court must
> view the evidence presented and all reasonable inferences taken
> therefrom in the light most favorable to the Commonwealth, as verdict
> winner. *Com. v. Dowling*, 883 A.2d 570, 573 (Pa. 2005); *Com. v.
> Davis*, 799 A.2d 860 (Pa. Super. 2002).   The test is whether the
> evidence, thus viewed, is sufficient to prove guilt beyond a reasonable
> doubt. *Com. v. Davis*, 799 A.2d 860 (Pa. Super. 2002); *Com. v. Hunter*,
> 768 A.2d 1136, 1141 (Pa. Super. 2001); *Com. v. Taylor*, 471 A.2d 1228
> (Pa. Super. 1984).   The credibility of witnesses and the weight of the
> evidence are matters within the providence of the trier of fact; the fact
> finder is free to believe all, some or none of the evidence. *Id.*
>
> Evidence will be sufficient to support a guilty verdict when it
> establishes each material element of the crime charged and the
> commission thereof by the accused, beyond a reasonable doubt. *Davis*,
> supra, at 864; *Com. v. Weston*, 749 A.2d 458, 461 (Pa. 2000)…. In
> making the determination as to whether the evidence adduced at trial is
> legally sufficient to sustain a guilty verdict, the entire trial record must
> be reviewed, as well as all evidence actually received. *Com. v. Hunter*,
> supra….

(Doc. 27, pp. 8, 9).  Clearly, the trial court applied the Pennsylvania equivalent of

the *Jackson* standard. (Doc. 27, pp. 8-10).  *See also Evans v. Court of Common

Pleas, Delaware Cnty.*, 959 F.2d 1227, 1233 (3d Cir. 1992) (noting that the test for

sufficiency of the evidence is the same under both Pennsylvania and federal law).

Because the Superior Court applied the correct legal standard, its adjudication satisfies review under the "contrary to" clause of § 2254(d)(1). *See, e.g., Williams*, 529 U.S. at 405-06.

We next consider whether the trial court's decision amounted to an "unreasonable application" of *Jackson.*

> *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury ... to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the [trial court's] verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the [trial court]." *Cavazos v. Smith*, 565 U.S. 1 (2011). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.' " *Ibid.* (quoting *Renico v. Lett*, 559 U.S.766 (2010)).
>
> - - -
>
> [T]he only question under *Jackson* is whether [the state court's] finding was so insupportable as to fall below the threshold of bare rationality. The state court of last review did not think so, and that determination in turn is entitled to considerable deference under AEDPA, 28 U.S.C. § 2254(d).

*Coleman,* 566 U.S. at 651, 656.

Riddick's sufficiency of the evidence argument raised here echoes the argument raised in state court. (Doc. 6, pp. 13-14; 17-21; Doc. 27, p. 10). He essentially argues that the testimony of Wright, Edwards, Bennett, and Mathis was insufficient to establish specific intent and asserts that if the court were to eliminate

the testimony of these witnesses, the evidence would be insufficient to sustain a

verdict.  (*Id*.; *Id*.).

In considering the issue, the trial court noted that "[t]o obtain a first degree

murder conviction, the Commonwealth must demonstrate that a human being was

unlawfully killed, the defendant did the killing, and the defendant acted with a

specific intent to kill.  *Com. v. Markman*, 916 A.2d 586, 598 (Pa. 2007)."  (Doc.

27, p. 10).  With regard to the intent element, the court noted that "[t]he intent to

kill need not be and rarely is established through a verbal expression.  The

Commonwealth may prove the willful, deliberate, and premeditated intent to kill

through circumstantial evidence.  The use of a deadly weapon on a vital part of a

victim's body may constitute circumstantial evidence of a specific intent to kill."

(*Id.*) (citations omitted).

The state court stated that "[t]he quantum of evidence presented by the

Commonwealth against the Defendant was nothing short of overwhelming."  (*Id.* at

11).  The PCRA court identified several individuals who witnessed Riddick shoot

Lewis in the back "(See Frank Roman, N.T. 12/14/06, P. 59-63, Terrence Wright

('Biz') N.T. 12/15/06, P. 120-122; Barry Edwards ('B-Red') N.T. 12/15/06, P. 98-

104, Lashawnna Bennet ('Toni') N.T. 12/15/05, afternoon, P. 66-68; Cashandra

Mathis, N.T. 12/18/06, P. 17-20)," noted that there were others who, although they

did not see the actual shooting, heard shots fired "(See Kerry Fuller, N.T. 12/13/06,

P. 90-91; Shatima Turner [(]'Lele'[)] N.T. 12/13/06, P. 126; Tewanna Stevens,

N.T. 12/13/06, P. 262; Belinda Glover ('Coco') N.T. 12/13/06, P. 208; Andy

Yurcanin, N.T. 12/13/06, P. 293; Mary Ann Salerno, N.T. 12/14/06, P. 15; Tiffany

Ross, N.T. 12/14/06, P. 34)," indicated that a witness testified that she saw

Riddick pull a gun in the bar area "(See Lashawnna Bennett ('Toni') N.T.

12/15/06, P. 60)" and, pointed out that Riddick admitted to another witness that he

shot and killed Lewis "(See Cashandra Mathis, N.T. 12/18/06, P. 24)."  (*Id.*).

In addressing Riddick's attack on the credibility of certain witnesses, the

court found that "the fact that most of the Commonwealth's witnesses had previous

encounters with the law did not disqualify them as witnesses.  When appropriate,

the witnesses' past criminal histories were divulged to the jury who not only took

same into consideration but were able to assess credibility predicated thereon."

(*Id.*).

The court also detailed other corroborating evidence.  Although the murder

weapon was not retrieved, the court determined that there existed evidence related

to the murder weapon which, despite being "circumstantial" and inconclusive, was

"highly probative in value."  (*Id.*).  Specifically, the search of Riddick's vehicle

revealed two Glock magazines and Winchester rounds.  (*Id.*).  Scranton Detective

Tim Harding testified that in 2004, during the course of an unidentified, unrelated investigation, he met with Riddick on two separate occasions. (*Id.* at 12). Riddick indicated that he was looking to trade his 38 caliber gun for a Glock. (*Id*. at 12). Additionally, Sergeant Eric Wolfgang ("Wolfgang"), in his capacity as a ballistics expert, concluded that all five spent bullet casings retrieved from the scene by crime scene specialist Scranton Detective Joseph Castellano were discharged from the same weapon. (*Id.*). Wolfgang further concluded that, given the markings on the casings, which are unique to the specific gun, the bullets had to have been discharged from a Glock or an early model Smith and Wesson Sigma Series Pistol. (*Id.* at 13). The court determined that this circumstantial evidence corroborated the Commonwealth's assertion that Riddick was the shooter. (*Id.*).

Significantly, Riddick does not argue that the state court's reliance on the above testimony and circumstantial evidence "was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S. at 656. Instead, he argues that "if the unreliable, inconsistent and perjurious testimony that was presented by convicted criminal and witnesses who were facing substantial prison terms was eliminated, the evidence presented was insufficient to support a murder conviction in any degree…. Moreover, the inconsistent statements, outright lies and misrepresentations perpetrated by Wright, Edwards, Bennett and Mathis are

not sufficient to establish that the Petitioner was the perpetrator of the crime and that he had specific intent to kill." (Doc. 6, citing *Fiore v. White*, 531 U.S. 225 (2000)).

"28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). Indeed, under the *Jackson* standard, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The proper question is not whether the witnesses were credible, but "whether there is sufficient evidence which, if credited, could support the conviction." *Id.* Further, *Coleman* cautioned courts that *Jackson* does not permit "imping[ing] on the jury's role as factfinder" through "fine-grained factual parsing." *Coleman*, 566 U.S. at 655. Rather, "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.' [*Jackson*, 443 U.S.] at 319." *Id.*

Taking into consideration all of this evidence as a whole, and viewing the evidence in the light most favorable to the prosecution, the Court finds that the state court's conclusion that there was sufficient evidence at trial to establish the necessary elements for first degree murder and to sustain the verdict, is not

objectively unreasonable.  There simply is no possibility that fair-minded jurist

could find that this determination conflicts with applicable Supreme Court

precedent.  Nor, based on review of the state court evidence, is it an unreasonable

determination of the facts.

2.   Ground II – Denial of Motion to Suppress

Riddick also raised this claim during post-trial motions and pursued it on

direct appeal.  The Supreme Court has held that "where the State has provided an

opportunity for full and fair litigation of a Fourth Amendment claim, a state

prisoner may not be granted federal habeas corpus relief on the ground that

evidence obtained in an unconstitutional search or seizure was introduced at his

trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976); *see also, Wright v. West*, 505

U.S. 277, 293 (1992); *Marshall v. Hendricks*, 307 F.3d 36 (3d Cir. 2002); *Deputy

v. Taylor*, 19 F.3d 1485 (3d Cir. 1994

In August 2005, prior to trial, Riddick filed a Motion to Suppress "any and

all items seized from the search of a green Chrysler which, at all times relevant

hereto, was owned in part by the Defendant Riddick.  The subject vehicle was

impounded on December 9, 2004 and later searched on December 13, 2004

pursuant to an otherwise valid search warrant."  (Doc. 14-10, pp. 2, 3).  He raised

the issue of "[was] the subject vehicle properly impounded or otherwise seized on

27

December 9, 2004?" (*Id.* at 7).  The trial court conducted a hearing on September 23, 2005 and, in a comprehensive Memorandum and Order issued on January 19, 2006, concluded that "the subject impoundment was proper and there existed no violation of the Defendant's constitutional rights."  (Doc. 14-10).

Riddick also raised the issue in his post-trial motion and on direct appeal.  (Doc.  27, pp. 7, 23; Doc. 14-14, pp. 4-8).  The state courts thoroughly considered the claim and rejected it.  In fact, the bulk of the Superior Court's opinion is devoted to this very issue.  (Doc. 14-14, pp. 4-8).

Because Riddick had the opportunity to fully and fairly litigate this claim, habeas relief is not available.

> 3.   <u>Ground IV - Ineffective Assistance of Counsel</u>

Riddick raises a multitude of ineffective assistance of counsel claims.  The clearly established ineffective assistance of counsel standard as determined by the Supreme Court of the United States is as follows:

> Ineffective assistance of counsel claims are "governed by the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *Shelton v. Carroll*, 464 F.3d 423, 438 (3d Cir. 2006) (citing *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). For AEDPA purposes, the *Strickland* test qualifies as "clearly established Federal law, as determined by the Supreme Court." *Williams*, 529 U.S. at 391, 120 S.Ct. 1495. Under *Strickland*, a habeas petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for

counsel's error, the result would have been different. 466 U.S. at 687, 104 S.Ct. 2052. For the deficient performance prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. This review is deferential:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance....

> *Id.* at 689, 104 S.Ct. 2052

> Not every "error by counsel, even if professionally unreasonable, ... warrant[s] setting aside the judgment of a criminal proceeding." *Id.* at 691, 104 S.Ct. 2052. "Even if a defendant shows that particular errors of counsel were unreasonable, ... the defendant must show that they actually had an adverse effect on the defense"; in other words, the habeas petitioner must show that he was prejudiced by counsel's deficient performance. *Id.* at 693, 104 S.Ct. 2052. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

> In assessing an ineffective assistance of counsel claim, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding.... In every case the court should be concerned with whether ... the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696, 104 S.Ct. 2052.

*Rainey v. Varner*, 603 F.3d 189, 197–98 (3d Cir. 2010).

When the state court has decided the claim on the merits, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*

The Superior Court stated that the proper standard governing ineffective assistance of counsel claims "requires a petitioner to plead and prove (1) the underlying issue is of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and (3) but for counsel's error, the result of the underlying proceeding probably would have been different. *Commonwealth v. Trieber*, 121 A.3d 435, 445 (Pa. 2015)." (Doc. 14-21, p. 4). The Third Circuit has specifically held that the very ineffectiveness assistance of counsel test relied upon by the Superior Court in this matter is not contrary to the Supreme Court's *Strickland* standard. *See Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000). Therefore, we reject Riddick's arguments that the Superior Court's decision is contrary to *Strickland*. (Doc. 6, pp. 31, 32, 34, 38-42).

Below, we consider whether the state courts' disposition of Riddick's exhausted ineffective assistance of counsel claims involved an unreasonable application of *Strickland* or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state courts.

> a.    *Trial counsel was ineffective in failing to object to the perjured testimony of Edwards.*[2]

Riddick raised this issue during the PCRA proceedings.  At that time, he mainly challenged counsel's effectiveness in cross examining Edwards about a letter Edwards authored and forwarded to the President Judge of the Lackawanna County Court of Common Pleas.  In that letter, Edwards states that "the statement he gave to authorities is 'inaccurate and contains facts which were known to me to be false....' In this letter, Edwards further states that he made the statement 'in retaliation for an ongoing quarrel...'" and the he really knows nothing about the incident."  (Doc. 14-17, p. 7).

However, in the argument he asserts in his federal petition, Riddick "concedes that trial counsel did establish to the jury, for the most part, that...Edwards...had presented inconsistent and deliberate misstatements to the police at previous proceedings" and, instead, focuses on trial counsel's

---

[2] As noted *supra*, this discussion will be limited to the fully exhausted portion of the claim.

effectiveness in challenging Edwards' pending federal charges and plea agreement

(Doc. 6, p. 28).  The portions of Edwards' cross examination focusing on the

federal charges and plea agreement are as follows:

> Q.    Now, on July 13, 2005, you signed a plea bargain with federal authorities; correct?
>
> A.    Around that time, yes.
>
> ***
>
> Q.    Now, you testified right out of the gate or right at the beginning of your testimony that your federal drug charge was it a conspiracy?
>
> A.    Possession with intent to deliver.
>
> Q.    Possession with intent of between 50 and 100 or 50 and 150?
>
> A.    50 to 150 grams.
>
> Q.    Between 50 and 150 grams of crack cocaine; correct?
>
> A.    Yes.
>
> Q.    In addition to that possession of a firearm and furtherance of the drug activity was added into you charge; correct?
>
> A.    As an enhancement, yes.
>
> Q.    Right. And that's a very heavy charge, is it not?
>
> A.    Yes.
>
> Q.    In fact, you can get a 20-year sentence on that drug charge, correct?

A.     Yes.

Q.     That's what it says in your plea agreement that you can get up to 20 years?

A.     Yes.

***

Q.     Now, this is your first really serious involvement where you could face very serious sentence; correct?

A.     Yes.

Q.     Now, do you have a lawyer on your federal case?

A.     Yes.

Q.     And there was a plea bargain arranged?

A.     Yes.

Q.     You have not been sentenced yet, have you?

A.     No.

Q.     All right.  Now, you want you sentence to be reduced, do you not?

A.     Of course, yes.

Q.     It's called a – there's a section in their rules 5-K or 5-K-1, are you getting familiar with that phraseology?

A.     Yes.

Q.     All right.  Now, this document that you signed, your plea agreement, I want to show you on page ten, paragraph 22.

[This question was followed with a lengthy sidebar discussing the danger to the witness of revealing his agreement to "do undercover work buying drugs." Doc. 14-4, pp. 5, 6.]

Q.    Mr. Edwards, your plea agreement states that you are willing to act in an undercover capacity in some instances?

[Again, a lengthy sidebar ensued.  Doc. 14-4, pp. 6, 7].

Q.    Mr. Edwards your plea agreement requires you to agree that you might wear a monitor or a wiretap if necessary?

A.    Yes?

Q.    Do you know that that's a more extensive agreement to cooperate than most federal charges get?

A.    No, I'm not aware.

Q.    But, in any event, you agree with me that you're willing to do what you have to do to reduce your federal sentence; correct?

A.    Yes, I mean –

Q.    You haven't been sentenced and you signed the plea agreement 17 or 18 months ago?

A.    Yes.

Q.    Right.  Are you aware that that's – it's very rare to wait that long to sentence somebody?

A.    No.  Like I said, this is my first time ever in this type of trouble so, no.  I mean, I was aware – I was pretty, you know, it's kind of obvious that I was – obviously waiting for the trial.

Q.    Has your federal attorney discussed with you the number of months that you get on your sentence.

A.    Yes.

Q.    And he showed you the points and the numbers and how you get reductions in numbers for acceptance of responsibility or for cooperation, etcetera?

A.    He didn't elaborate on it, but a PSI – I got a PSI, presentence investigation report, and I think it recommended 87 to 180 months, that the only thing as far as cooperation goes, the leniency is up to the judge, so he doesn't even know  himself.

***

Q. So you are saying you really want to do as little amount of time in federal prison as you can; right?

A.    I mean, I have two kids.

***

Q.    Do you know when you federal sentencing date is?

A.    No.

***

Q.    Mr. Edwards, you didn't come forward with any of this information until after you were federally charged, correct?

A.    Yes.

(Doc. 14-4, pp. 4-9, 13; Doc. 14-5, p. 1).

The PCRA court thoroughly considered trial counsel's effectiveness on the cross examination of Edwards and concluded that "[d]efense counsel vigorously attacked Edwards' credibility by cross examining [him] on the letter as well as on a plea agreement that he had entered into in regard to various federal charges.  (N.T. 12/15/06 at 9-28)."  (Doc. 14-17, p. 7., 8, citing N.T. 12/15/06, at 9-28, 98-104, 114-121, 136-140).  On appeal, the Superior Court agreed:

> Prior to trial, Edwards gave a statement indicating that his initial statement to police was inaccurate.  The record reveals defense counsel was aware of Edwards' changed statement, and challenged his credibility at trial.  N.T. Trial, 12/15/06, at 9-12.  Likewise, defense counsel examined Edwards on a plea agreement regarding pending federal charges against Edwards.  *Id.* at 26-27.  Furthermore, as we noted, Edwards was but one of five eyewitnesses to the shooting.  Appellant's first claim of ineffective assistance lacks arguable merit.

(Doc. 14-21, pp. 4, 5).

It is evident that the Superior Court reviewed the portion of the trial transcript covering the cross examination of Edwards on the issue of his federal plea agreement and concluded that Riddick's claim lacked arguable merit. The decision is a reasonable application of the arguable merit prong of *Strickland* and constitutes an objectively reasonable determination of the facts in light of the evidence presented to the state court.  Riddick is not entitled to relief on this claim.

   b.   *Failure to Object to Firearm Paraphernalia and Failure to Request a Hearing to Test the Veracity of the Statements Made*

> *in the Affidavit of Probable Cause Supporting the Search and Seizure of Riddick's Vehicle.*

Riddick jointly addresses these two claims.  He essentially argues that counsel at his evidentiary hearing and trial were ineffective in failing to have the firearm paraphernalia obtained during the search of his vehicle suppressed. He argues that the affidavit of probable cause contained material misrepresentations and false statements designed to demonstrate exigent circumstances.

With regard to the Glock handgun paraphernalia, the Superior Court concluded that the claim lacked arguable merit because the evidence against Riddick was overwhelming "even without the murder weapon."  (Doc. 14-21, p. 5).  Specifically, the court noted "[a]t trial, the Commonwealth presented the testimony of five eyewitnesses who confirmed that Appellant shot the victim, Robert Lewis after a barroom altercation.  Appellant and the victim argued in the bar after the victim took Appellant's girlfriend's cell phone.  The argument continued outside the bar, where Appellant fired three shots at the ground in front of the victim.  As the victim fled, Appellant fired three more shots.  One of those shots hit the victim in the upper back, killing him." (*Id.* at 4).  As concerns counsels' ineffectiveness in testing the veracity of statements made in the probable cause affidavit, the court highlighted that Riddick acknowledged counsel did, in fact, challenge the probable cause affidavit in a motion to suppress.  The court also

emphasized that he failed to identify any specific deficiency in counsel's litigation of the motion to suppress.  (*Id.* at 6, 7).

The Superior Court reasonably applied the *Strickland* standard in finding that the claim lacked arguable merit.  The court's decision also contains an objectively reasonable determination of the facts in light of the evidence presented.[3]  (Doc. 14-17, pp. 8-11).  Hence, Riddick is not entitled to relief on this claim.

> c.   *Trial counsel was ineffective for abandoning innocence defense and arguing self defense during closing arguments.*

The Superior Court summarily rejected this claim:  "We have already explained that the Commonwealth produced overwhelming evidence that Appellant was the shooter.  Thus, Appellant's actual innocence defense lacks arguable merit, and counsel acted reasonably in pursuant a self-defense theory." (Doc. 14-21, p. 5).

---

[3] The Superior Court also concluded that to the extent that he was attempting to challenge the validity of the search warrant, he was  prevented from doing so as that issue had been previously litigated.  (Doc. 14-21, citing 42 PA.C.S.A. § 9545(a)(3)).  As is evident from the PCRA court's lengthy discussion of the evidentiary hearing held on Riddick's motion to suppress, in which he challenged the impoundment and pretrial search of his jointly owned vehicle, as well as the Memorandum and Order the trial court issued denying the motion to suppress, there is no question that the validity of the search warrant was previously litigated.  (Doc. 14-17, pp. 8-11; Doc. 14-10).

Riddick's sufficiency of the evidence claim required this Court to consider the evidence adduced at trial including the "quantum of evidence" that Riddick was the shooter.  (Doc. 27, p. 11).  Review of that evidence confirms that the Superior Court's above determination that the claim lacked arguable merit was a reasonable application of *Strickland*.  Additionally, it constitutes an objectively reasonable determination of the facts in light of the evidence presented to the state court.  (Doc. 14-17, p. 11, citing N.T. 12/14/06 Roman at 83-85; p. 12, citing, N.T. 12/15/06 at 8-12, Frank Roman, N.T. 12/14/06 at 67, Terrence Wright, N.T. 12/14/06 at 130-34, and 12/15/06 at 33-58; Gary Edwards, N.T. 12/15/06 at 8-27; Lashawanna Bennett, N.T. 12/15/06 at 104-108; and Cashandra Matthis, N.T. 12/18/06 at 43-44).

> **d.** *Trial counsel was ineffective for failing to establish a different version of the facts given Kendall Scott had been identified as the perpetrator of the homicide*

Riddick argues that trial counsel was ineffective in failing to call witnesses who reported that Kendall Scott committed the murder.  In considering the claim, the Superior Court set forth the following standard of review:  "To prevail on a claim of ineffectiveness for failure to call a witness, the appellant must demonstrate that: (1) the witness existed; (2) the witness was available; (3) trial counsel was informed of the existence of the witness or should have known of the

39

witness' existence; (4) the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) the absence of the testimony prejudiced appellant. *Commonwealth v. Malloy*, 856 A.2d 767, 782 (Pa. 2004)." (Doc. 14-21, p. 7). The Superior Court considered the PCRA court's rejection of the claim due to Riddick's failure to establish any of the above elements. (*Id.*) In considering the five elements, the PCRA court stated:

> In the first instance, Riddick does not identify who these alleged witnesses are and whether they were available and willing to testify. Secondly, there is no reference as to who Kendall Scott is or to his relationship to the victim on the night of the incident. Thirdly, the Petition itself fails to list the witnesses, the substance of their testimony, or supporting affidavits. 42 Pa.C.S. § 9545(d); Pa.R.Crim.P. 902(A)(15)(D). Lastly, Petitioner does not state whether trial counsel knew or should have known of this alleged information and the circumstances surrounding same.

(Doc. 14-18, p. 4). The Superior Court further noted that he also failed to provide any additional information in his appellate brief and, as such, could "discern no error in the PCRA court's rejection of this claim." (Doc. 14-21, p. 7). The state court reasonably applied the *Strickland* standard in finding that the underlying claim lacked arguable merit. Riddick is not entitled to relief on this claim.

> e. *Trial counsel was ineffective for advising the Petitioner not to testify on his own behalf.*

Riddick argues that any hopes of succeeding with a self defense theory required him to take the stand. (Doc. 6, p. 39). He states "given the testimony of

the Commonwealth's witnesses and their damning testimony, trial counsel should

have advised the Petitioner to testify despite the Petitioner having been convicted

of a crime of *crimen falsi*.  Indeed, nearly every witness that testified had crimes of

*crimen falsi*, thus the jury would not have been unduly persuaded by that fact."

(*Id.* at 40, 41).  It is his position that the advice not to testify "was not reasonably

strategic."  (*Id.* at 41).

The Superior Court opined as follows:

Appellant claims counsel erroneously advised him that prior bad acts
evidence could come in against him if he testified.  [He] further claims
he has no prior bad acts that would have been admissible.

The decision of whether or not to testify on one's own behalf is
ultimately to be made by the defendant after full consultation with
counsel.  In order to sustain a claim that counsel was ineffective
for failing to call the appellant to the stand, the appellant must
demonstrate either that counsel interfered with his right to testify,
or that counsel gave specific advice so unreasonable as to vitiate a
knowing and intelligent decision to testify on his own behalf.

*Commonwealth v. Uderra*, 706 A.2d 334, 340 (Pa. 1998 (citations
omitted), cert. denied, 526 U.S. 1070 (1999).

In this case, the trial court permitted an adjournment so that Appellant
could confer with counsel about his decision to testify.  N.T.,
12/18/2006, at 9-12.  At the conclusion of their discussion, Appellant
and counsel determined that Appellant would not testify.  *Id.*
Furthermore, as the PCRA court noted, Appellant has several prior
*crimen falsi* convictions that the prosecution could have used to
impeach his credibility.  *See* Pa.R.E. 609(a) ("For the purpose of
attacking the credibility of any witness, evidence that the witness has
been convicted of a crime, whether by verdict or by plea of guilty of

nolo contendere, must be admitted if it involved dishonesty or false statement."). [n. 1 Appellant's brief offers no argument to support the claim that he had no prior convictions admissible to impeach him. Rather, he claims counsel should have advised him to testify given the shift in strategy from actual innocence to self-defense.  Appellant's Brief at 17-18.  Appellant fails to explain how his testimony would have aided a self-defense theory."].   Thus, the record reflects full consultation and no evidence that counsel's advice vitiated a knowing and intelligent decision on Appellant's part.  This claim fails for lack of arguable merit.

(Doc. 14-21, pp. 7, 8).

The above constitutes a reasonable application of the *Strickland* standard.  In determining that the underlying claim lacked arguable merit, the state court relied on a standard that mirrors governing Supreme Court precedent, which holds that "the accused has the ultimate authority to make certain fundamental decisions regarding the case, [including] as to whether to ... testify in his or her own behalf." *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *see also Rock v. Arkansas*, 483 U.S. 44, 49-56 (1987).  Further, the decision is based on objectively reasonable factual findings in light of the evidence presented.  (Doc. 14-18, citing N.T. 12/18/06, pp. 109, 111-13).  Habeas relief is not warranted.

> f.    *Trial counsel was ineffective for failing to present a ballistic witness during trial.*

Riddick argues that an expert ballistic witness would have been "beneficial" in light of the testimony presented by the Commonwealth's expert ballistic

witness, Sergeant Wolfgang.  (Doc. 6, p. 41).  "Moreover, had an expert ballistic

witness been presented for the defense, the expert could have proffered his own

opinions as to the number of handguns that were capable of firing the projectiles

that were recovered from Lewis and at the scene.  Indeed, although testimony

revealed that a Glock and Smith and Wesson were capable of firing the projectiles,

a defense expert could have increased the number of potentials dramatically.  Thus,

counsel was ineffective for failing to present such an expert."  (*Id.* at 41, 42).

The PCRA court initially addressed the issue noting that "it is generally

accepted that 'trial counsel need not introduce expert testimony on his client's

behalf if he is able to cross examine prosecution witnesses and elicit helpful

testimony' ", and "[f]urthermore, 'trial counsel will not be deemed ineffective for

failing to call a medical, forensic, or scientific expert merely to critically evaluate

expert testimony which was presented by the prosecution.'  Thus, the focus of this

inquiry involves reviewing the record to determine if defense counsel effectively

cross examined Mr. Wolfgang and elicited helpful testimony."  (Doc. 14-18, p. 7

(citations omitted)).   The court then stated:

> On cross examination, Wolfgang admitted that, although the
> spent cartridges retrieved from the crime scene came from the same
> firearm, he could not specifically identify the make and model of the
> firearm.  (N.T. 12/18/06 at 107-08).  Furthermore and although the
> spent cartridges and the undischarged bullets in the magazine and in
> Riddick's vehicle were of the same caliber and manufactured by the

same manufacturer (Winchester), Wolfgang could not "make a connection["] between the undischarged bullets that were in the magazine and the casings that were found on the ground. (N.T. 12/18/06 at 110). Lastly, Wolfgang acknowledged that Winchester manufactures "millions and millions of these type of bullets" per year, all of which rendered Wolfgang's analysis simply inconclusive. (N.T. 12/18/06 at 110).

From a review of the record, as referenced herein, it is apparent that Riddick's trial counsel was effective in eliciting helpful testimony from the prosecution's ballistic expert. Wolfgang was only able to opine that the spent cartridges and the undischarged cartridges in Riddick's vehicle were manufactured by Winchester. Furthermore, Wolfgang also opined that the spent cartridges could have been fired from one of many types of firearms, one of which is a Glock. Because the subject firearm was not recovered, Wolfgang was not able to opine that the spent cartridge came from the same firearm that Riddick allegedly possessed at the time of the event.

Although Petitioner Riddick has identified Defendant's ballistic expert in a correspondence he forwarded to his PCRA attorney, a copy of which was provided to the Court, he has failed to articulate what evidence, if any, was available to be introduced which would significantly contradict the findings of the prosecution's ballistic expert. *Commonwealth v. Bryant*, 855 A.2d 726 (Pa. 2004).

(Doc. 14-18, pp. 8, 9).

On appeal, the Superior Court discerned no arguable merit to Riddick's claim. (Doc. 14-21, p. 9). In so finding, the court stated "the Commonwealth's ballistics expert simply testified that recovered casings were nine millimeter casings consistent with Glock firearms. The expert did not conclusively link the casings to the magazine recovered from Appellant's car. On cross-examination,

defense counsel highlighted the lack of a conclusive link between the casings and

Appellant's magazine, and highlighted the expert's statement that the casings also

were consistent with certain Smith and Wesson firearms."  (*Id.*).

The state court reasonably applied the *Strickland* standard in finding that the

underlying claim lacked arguable merit.  Further, the factual findings are

objectively reasonable in light of the evidence presented.  (Doc. 14-18, pp. 7, 8,

citing N.T. 12/18/06, pp. 107-08, 110; Doc. 14-7, pp. 1-5).  Riddick is not entitled

to relief on this claim.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254 will be denied.

## V.   <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a

certificate of appealability ("COA"), an appeal may not be taken from a final order

in a proceeding under 28 U.S.C. § 2254.  A COA may issue only if the applicant

has made a substantial showing of the denial of a constitutional right.  28 U.S.C. §

2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of

reason could disagree with the district court's resolution of his constitutional

claims or that jurists could conclude the issues presented are adequate to deserve

encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322 (2003). Riddick fails to demonstrate that a COA should issue.

The denial of a certificate of appealability does not prevent Riddick from appealing the Order denying his petition so long as he seeks, and obtains, a certificate of appealability from the Third Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b)(1).

A separate Order will enter.